KATE LEE JONES v. HARRY SCHAFFER, DOROTHY SCHAFFER, W. H. HARRIS, AND JOHN W. HARRIS, THROUGH HIS GUARDIAN AD LITEM, W. H. HARRIS.

(Filed 27 April, 1960.)

**1. Appeal and Error § 51—**

The correctness of a judgment of nonsuit entered in favor of one defendant at the close of plaintiff's evidence must be determined without reference to the evidence offered thereafter by the other defendant.

**2. Automobiles § 17—**

G.S. 20-155(a) has no application to an intersection governed by automatic traffic control signals.

**3. Same—**

The failure of a motorist to stop in obedience to the red light of a traffic control signal in violation of a municipal ordinance is negligence *per se*.

**4. Same—**

If at the time of starting forward into an intersection in response to a green traffic signal no other vehicle is then within the intersection or approaching the intersection within the range of the motorist's vision, the motorist's primary obligation thereafter is to keep a proper lookout in his direction of travel, and in such event he has the right to assume that a motorist approaching the intersection from his left will stop in obedience to the traffic signal unless and until something occurs that is reasonably calculated to put him on notice that such other motorist will unlawfully enter the intersection.

**5. Automobiles § 7—**

It is the duty of a motorist not merely to look but to keep a lookout in the direction of travel, and he is charged with the duty of seeing what he ought to see.

**6. Automobiles §§ 39, 41a:    Negligence § 24a:    Trial § 22c—**

While discrepancies, even in plaintiff's evidence, are ordinarily for the jury to resolve in the exercise of its function in determining the weight to be given the testimony, this rule does not apply when the only testimony favorable to plaintiff on a material question is in direct conflict with the physical facts established by plaintiff's uncontradicted evidence, and when such aspect of the evidence favorable to plaintiff is inherently impossible upon the undisputed physical facts, nonsuit is proper.

**7. Automobiles § 41g— Evidence held insufficient to show negligence on part of driver entering intersection with green light.**

The accident occurred at the intersection of two four-lane streets, the intersection being controlled by automatic traffic control signals. The evidence tended to show that the driver of one car involved in the collision was traveling south in the right-hand lane, that another car was to his left in the left southbound lane, that both cars started into the intersection shortly after the traffic light facing them turned green, that

the driver of the car in the left southbound lane, upon seeing a car approaching from the left along the intersecting street at a rate of speed not less than 30 m.p.h. stopped some two feet short of the northern curb line of the intersecting street, but that the driver in the right southbound lane continued on and, when his car had gotten some two to four feet within the intersection, was struck by the westbound car. The testimony of one witness, together with plaintiff's uncontradicted testimony as to the physical facts at the scene of the accident in regard to the respective speeds of the vehicles and the distances traveled by them, disclosed that the southbound cars had started forward before the westbound car came into view and entered the intersection, although there was some testimony in conflict with the physical facts, that the westbound car first entered the intersection. *Held:* The evidence is insufficient to show that the driver of the car in the right southbound lane could or should have seen the westbound car in time to have avoided the collision in the exercise of due care, and nonsuit as to such driver was properly entered.

**8. Damages § 12:    Evidence § 44—**
A medical expert witness who has examined the injured party and given his opinion as to the permanent partial disability to her neck may testify as to the injured person's physical ability to perform a particular kind of work.

APPEAL by plaintiff from *Campbell, J.,* August 31 Term, 1959, of MECKLENBURG.

Personal injury action growing out of a collision that occurred October 26, 1957, about 2:15 p.m., between the Schaffer and Harris cars, at the intersection of North Brevard and East Eleventh Streets in the City of Charlotte.

The Schaffer car, a 1955 Oldsmobile, headed west on Eleventh Street, was being operated by defendant Dorothy Schaffer, the sole occupant. Her father-in-law, defendant Harry Schaffer, was the owner.

The Harris car, a 1951 Nash Rambler, headed south on Brevard Street, was being operated by defendant John W. Harris, then sixteen years of age. His father and guardian *ad litem,* defendant W. H. Harris, was the owner.

There were three passengers in the Harris car: (1) Mrs. Jones, the plaintiff, on the front seat, to the right of the driver; (2) John Douglas Jones, plaintiff's son and then thirteen years of age, on the back seat, right side, directly behind his mother; and (3) R. J. Reaves, then (about) fourteen years of age, on the back seat, left side, directly behind the driver.

The case came on for trial upon the issues raised by plaintiff's second amended complaint and (separate) answers thereto filed by defendants Schaffer and by defendants Harris. Plaintiff, in her second amended complaint, alleged the collision and her injuries were proximately caused by the joint and concurrent negligence of the operators

of the Schaffer and Harris cars for which she was entitled to recover damages of $100,000.00 from the operators and owners of said cars.

In accordance with city ordinances, automatic traffic control signals had been erected for the regulation of traffic at this intersection and were functioning properly at the time of the collision, "changing from green to yellow to red and from red to green, and . . . when one light on one street would be green or yellow, the light on the other street would be red, and vice versa, and . . . they were synchronized."

Brevard Street, north of the intersection, was thirty-six feet wide from curb to curb, with four marked traffic lanes, each nine feet wide, two (the westerly lanes) for southbound traffic and two (the easterly lanes) for northbound traffic. The Harris car approached the intersection in the right southbound lane, the lane adjacent to the curb along the west side of Brevard Street. A 1953 Ford car, operated by Mrs. Ruth M. Shuler, approached the intersection in the left southbound lane, the lane adjacent to the center of Brevard and to Harris' left.

Street markings in the area included the following: (1) A heavy white line, some eleven feet north of the intersection, crossed the two lanes for southbound traffic on Brevard Street. (2) A pedestrian cross-walk, a seven-foot walkway between white parallel lines, extended (thirty-six feet) between the northeast and northwest corners of the intersection. The *southerly* cross-walk line was in line with the curb along the north side of Eleventh Street.

Eleventh Street, east of the intersection, was forty feet wide from curb to curb, with four marked traffic lanes, each ten feet wide, two (the northerly lanes) for westbound traffic, and two (the southerly lanes) for eastbound traffic. The Schaffer car approached the intersection in the right westbound lane, the lane adjacent to the curb along the north side of Eleventh Street. Street markings, similar to those described above, were on Eleventh Street, east of the intersection and between the northeast and southeast corners of the intersection.

A brick building, fronting on Brevard and extending sixty feet along Eleventh, occupied the northeast corner. On each street, the sidewalk extended some nine feet from the curb to the adjacent wall of this building. As they approached the intersection, this building was to the left of Mrs. Shuler and of Harris and was to the right of Mrs. Schaffer.

The evidence, set forth in the opinion, is for consideration against the background of the foregoing uncontroverted facts.

At the close of plaintiff's evidence, judgment of involuntary non-

suit was entered, dismissing the action, as to defendants Harris. Plaintiff excepted to this judgment and appealed therefrom.

Evidence was then offered by defendants Schaffer, to wit, the testimony of Mrs. Schaffer and of Eugene Schaffer, her husband.

At the close of all the evidence, the court submitted, and the jury answered, the following issues: "1. Was the plaintiff injured by reason of the negligence of the defendant Dorothy Schaffer, as alleged in the Complaint? ANSWER: Yes. 2. Was the defendant Dorothy Schaffer acting as agent for the defendant Harry Schaffer, as alleged in the Complaint? ANSWER: Yes. 3. What amount, if any, is the plaintiff entitled to recover? ANSWER: $7,500.00."

Judgment, that plaintiff have and recover from defendants Schaffer the sum of $7,500.00 and costs, was entered. Plaintiff excepted to this judgment and appealed.

*Bailey & Booe for plaintiff, appellant.*
*Carpenter & Webb for defendants Schaffer, appellees.*
*Helms, Mulliss, McMillan & Johnston, W. H. Bobbitt, Jr., and Larry J. Dagenhart for defendants Harris, appellees.*

BOBBITT, J. As to defendants Harris, plaintiff seeks a reversal of the judgment of involuntary nonsuit. As to defendants Schaffer, plaintiff, contending her damages greatly exceeded $7,500.00, seeks a new trial. Actually, there are two appeals; and, while properly presented in one record, each appeal requires separate consideration.

I

The Harris Nonsuit

The sole question is whether the evidence offered by plaintiff, considered in the light most favorable to her, was sufficient to warrant submission thereof to the jury as to the alleged actionable negligence of John W. Harris.

*In limine,* it is noted: (1) There was ample evidence to support a finding that defendant W. H. Harris, the owner of the 1951 Nash Rambler, is liable, under the family purpose doctrine, for the actionable negligence, if any, of John W. Harris, his minor son, on the occasion of the collision. (2) Since the judgment of involuntary nonsuit was entered at the close of plaintiff's evidence, the testimony offered later in behalf of defendants Schaffer is not for consideration on plaintiff's appeal from the Harris nonsuit.

According to plaintiff's allegations: Harris stopped at the intersection in obedience to a red signal light. After the signal light facing him changed to green, Harris proceeded into the intersection.

Mrs. Schaffer, notwithstanding the signal then facing her was red, entered the intersection at an excessive rate of speed. Mrs. Schaffer drove into the intersection first and undertook to proceed straight through it ahead of the car driven by Harris. Harris could and should have observed the prior entry and occupancy of the intersection by the car driven by Mrs. Schaffer.

Plaintiff alleged, in substance, that Harris was negligent in that: (1) he failed to yield the right of way and permit the Schaffer car to clear the intersection; (2) he failed to keep a proper lookout and thereby observe the Schaffer car; (3) he failed to keep his car under control; and (4) he failed to avoid a collision with the Schaffer car although he had the means to do so.

Uncontradicted evidence is to the effect that the traffic signal was red when Mrs. Schaffer approached and entered the intersection. Williamson, who was standing on the Used Car Lot at the northwest corner of the intersection, testified that he was looking (east) down Eleventh Street and first observed the approach of the Schaffer car when it was approximately sixty feet from the intersection and that it was 30-35 feet back from the intersection when the lights for traffic on Eleventh Street changed to red. Testimony as to when others witnesses first observed the Schaffer car will be discussed below.

Mrs. Schaffer approached and entered the intersection from Harris' left. However, whether Mrs. Schaffer or Harris had the right of way at this intersection was governed by the ordinance under which the automatic traffic control signals were erected and maintained, not by G.S. 20-155(a). Compare *Kennedy v. James, post,* 434, 113 S.E. 2d 889.

The failure of Mrs. Schaffer to stop in obedience to the red light, a violation of the city ordinance, was negligence *per se. Currin v. Williams,* 248 N.C. 32, 34, 102 S.E. 2d 455, and cases cited. Harris' liability, if any, depends upon whether, as he approached and entered the intersection, what he could and should have seen was sufficient to put him on notice, at a time when he could by the exercise of due care have avoided the collision, that Mrs. Schaffer would not stop in obedience to the red light. *Currin v. Williams, supra,* and cases cited.

When the collision occurred, according to uncontradicted evidence, the Schaffer car was proceeding at 30-35 or 35-40 miles per hour. The highest estimate of the speed of the Harris car was five miles per hour. The front of the Harris car was 2-4 feet in the intersection. The front of the Schaffer car had proceeded some thirty feet into the in-

tersection. The right front fender of the Schaffer car struck the left front fender of the Harris car.

Uncontradicted evidence tends to show that Mrs. Shuler and Harris stopped in their respective lanes in obedience to the red light and that neither proceeded until after the light facing them had changed from red to green. As to the exact position of their cars while they waited for the light to change, there are these discrepancies: Plaintiff, her son and Reaves testified that the front of the Harris car was (approximately) at the northerly pedestrian cross-walk line. Mrs. Shuler testified that she stopped "about the broad white line, about 11 feet from the intersection," and that the front of her car and the front of the Harris car were "even approximately as nearly as" she could tell. Harris, whose testimony on adverse examination was offered by plaintiff, testified that he stopped "about two or three feet behind the northerly white line" of the pedestrian cross-walk. He testified that the Shuler car was "a little ahead" of him.

The substance of Mrs. Shuler's testimony: When her car was stopped at the broad white line she could see approximately sixty feet to her left up Eleventh Street. After the light facing her changed to green, she waited "an additional two or three seconds" before starting. Her car and the Harris car "began moving about the same time." When she started, no car moving west on Eleventh Street was in sight. As she proceeded, she saw the Schaffer car "coming around the corner of the building." It was then "approximately 10 feet back from the broad white line in her lane of traffic." She "caught a glance of it out of the corner of (her) eye," applied the brakes "almost simultaneously" and stopped "approximately two feet back" from the southerly line of the pedestrian cross-walk. She traveled a distance of "about 10 feet." She testified: "Yes, I did just miss getting hit by a couple of feet. Yes, an instant or so after I stopped, John Harris got hit." Again: "No, the Harris car did not get ahead of me until I stopped."

The substance of plaintiff's testimony: When the Harris car stopped, she was "looking east" and could see approximately 125 feet up Eleventh Street. She glanced at the signal light and saw it had changed to green. Simultaneously, she glanced to the left and saw the Schaffer car. When she first observed it, the Schaffer car was five to ten feet east of the intersection, was coming at a rapid rate of speed, 30-35 miles per hour, and continued at this speed until the collision. She "knew it (the Schaffer car) would not stop." After she first observed the Schaffer car, Harris started to move forward. The Schaffer car entered the intersection first. On

cross-examination: When Harris started forward, some cars, headed west on Eleventh Street in the traffic lane adjacent to the center of the street, had stopped in obedience to the red light. As to whether she had time, from the time she first observed the Schaffer car until the collision, to move, cry out, or do anything except just realize there was a car there, her testimony was that it all happened so suddenly she did not believe she had time to do so.

The testimony of John Douglas Jones, as to the position and speed of the Schaffer car when he observed it, is substantially in accord with the testimony of his mother. In addition, he testified: ". . . I watched it (the Schaffer car), I thought we were going to sit still and as it (the Schaffer car) made the main intersection line I felt us moving and I hollered out and headed for the floorboard of the car. . . . At the time I felt our car begin to move for the first time, Mrs. Schaffer's car was approximately at the intersection of the main intersection."

The testimony of Reaves, who was facing (west) toward his right is to the effect that he did not see the Schaffer car until he heard Jones holler, "Look out"; that "(a)fter Douglas Jones hollered, our vehicle started up to move out south on Brevard" and "continued to move out into the street"; and that, after Jones hollered, he looked up and saw the Schaffer car "about five feet to the left front of Mr. Harris' car."

The substance of the testimony of John W. Harris: He was talking to plaintiff, facing generally to his right. When the light facing him changed to green he "paused a second or two" before starting forward. He started shortly after the car to his left, the Shuler car, had started. While doing so, he was looking straight ahead. He was relying upon what the Shuler car was doing and on the green light. The Shuler car obstructed his vision to the left. The Nash Rambler "was a little smaller and a little lower" than the Shuler car. The traffic lane for the Shuler car was slightly higher than the curb traffic lane. When the Shuler car came to a stop, he had his first view to his left. Then, for the first time, he saw the Schaffer car. He was then approximately at the southerly line of the pedestrian cross-walk. The Schaffer car "lacked approximately eight feet of having gone all the way through the intersection at that time." He testified: "The front of my vehicle had gone about two, maybe three feet into the intersection at the time the two cars came together."

While, as stated above, a bystander, who had a clear view (east) down Eleventh Street, saw the Schaffer car when it was approximately sixty feet east of the intersection, Mrs. Shuler did not see

it until it was approximately ten feet east of the "broad white line," presumably the "stop line," and plaintiff and her son (who were facing east) did not see it until it was 5-10 feet east of the intersection.

Unquestionably, Harris, from the time he actually saw the Schaffer car, could not have avoided the collision. The crucial question is whether he could and should have observed the Schaffer car sooner, either before the Harris car began to move or before it reached and entered the intersection, and at a time when he by the exercise of due care could and should have avoided the collision.

In *Wright v. Pegram,* 244 N.C. 45, 92 S.E. 2d 416, *Higgins, J.,* states the rule established by prior decisions as follows: ". . . a motorist facing a green light as he approaches and enters an intersection is under the continuing obligation to maintain a proper lookout, to keep his vehicle under reasonable control, and to operate it at such speed and in such manner as not to endanger or be likely to endanger others upon the highway. *Ward v. Bowles,* 228 N.C. 273, 45 S.E. 2d 354. Nevertheless, in the absence of anything which gives or should give him notice to the contrary, a motorist has the right to assume and to act on the assumption that another motorist will observe the rules of the road and stop in obedience to a traffic signal." *Stathopoulos v. Shook,* 251 N.C. 33, 110 S.E. 2d 452, and cases cited. Also, see *Carr v. Lee,* 249 N.C. 712, 107 S.E. 2d 544.

"It is the duty of the driver of a motor vehicle not merely to *look,* but to *keep an outlook* in the direction of travel; and he is held to the duty of seeing what he ought to have seen." *Wall v. Bain,* 222 N.C. 375, 23 S.E. 2d 330; *Kellogg v. Thomas,* 244 N.C. 722, 94 S.E. 2d 903.

"While ordinarily a driver may proceed on a green or 'go' light or signal, he may not rely blindly thereon but should exercise due care as to others who may be in the intersection." 60 C.J.S., Motor Vehicles § 360(b). Even so, a green light is a signal for a motorist to proceed; and if, when he starts forward in response to the green light, no other vehicle is then within the intersection or approaching the intersection within the range of his vision under circumstances sufficient to put him on notice that it is not going to stop in obedience to the red light, his primary obligation thereafter is to keep a proper lookout in the direction of his travel. In such case, he has a right to assume that any motorist approaching from his left on the intersecting street will stop in obedience to the red light facing him unless and until something occurs that is reasonably calculated to put him on notice that such motorist will unlawfully enter the intersection. Here nothing occurred to direct Harris' attention to the un-

lawful conduct of the operator of the Schaffer car until an instant prior to the collision.

While there are discrepancies as to whether the front of the Shuler car or the front of the Harris car was closer to the intersection when these cars were stopped, waiting for the light to change, the only evidence as to which of these cars started first is the following: Mrs. Shuler testified that these cars began moving about the same time and that the Harris car did not get ahead of her until after she had stopped. Harris testified that the Shuler car started first and was ahead of him until after the Shuler car had stopped.

Independent of evidence tending to show that Harris' view to the left, particularly with reference to the lane of travel on Eleventh Street adjacent to the curb, was obstructed by the building at the northeast corner and also by the Shuler car, it is noted that Harris is chargeable with notice only of what he could and should have seen had he looked to his left. *Stathopoulos v. Shook, supra,* and cases cited. In this connection, it is noted that, according to uncontradicted evidence, two or more cars, headed west on Eleventh Street in the traffic lane adjacent to the center of the street had actually stopped in obedience to the red light. This was the traffic lane of which Harris would have the better view. It is noted further that plaintiff testified the collision happened so suddenly after she (facing east) first observed the Schaffer car she had no opportunity to make an outcry or otherwise react to the emergency created by the failure of the Schaffer car to stop in obedience to the stop sign.

If, as the testimony of Mrs. Shuler tends to show, the Schaffer car came into view and entered the intersection after the Shuler and Harris cars had started forward, the evidence, when considered in the light most favorable to plaintiff, is insufficient to support a finding that Harris, by the exercise of due care, should have observed the unlawful operation of the Schaffer car at a time when he, by the exercise of due care, could have stopped and avoided the collision. It is noteworthy that Mrs. Shuler was nearer to and had the better view of the inside traffic lane in which the Schaffer car was traveling. True, she stopped when she caught a glimpse of the Schaffer car, then ten feet back from the broad white line. She missed getting hit by "a couple of feet." "An instant or so" after she stopped, Harris got hit. The Harris car had gone beyond the Shuler car a maximum of six feet, a maximum of four feet into the intersection. Thus, a "split second" elapsed between the time Mrs. Shuler stopped and the collision. Whether Harris could have observed the Schaffer car had he looked to his left at the precise moment when it came into view

is not the test. As stated by *Higgins, J.,* in *Wright v. Pegram, supra*: "Naturally he could take a last look in only one direction." The test is whether under all the circumstances his failure to observe it in time to have avoided the collision may be attributed to his failure to exercise due care to keep a proper lookout. The standard of care is that of an ordinarily prudent man, not of an infallible or omniscient man.

Plaintiff contends, and rightly so, that "(d)iscrepancies and contradictions in the evidence, even though such occur in the evidence offered in behalf of plaintiff, are to be resolved by the jury, not by the court." *Stathopoulos v. Shook, supra,* and cases cited. She asserts, and rightly so, that there is testimony to the effect that the Schaffer car had actually entered and was within the intersection *before the Harris car started to move.* Indeed, the gist of the testimony of the Jones boy and of Reaves is that the Schaffer car had reached the center of Brevard Street before the Harris car started to move. This testimony is in direct conflict with the testimony of Mrs. Shuler.

Ordinarily, the weight to be given the testimony of a witness is exclusively a matter for jury determination. Even so, this rule does not apply when, as here, the only testimony that would justify submission of the case for jury consideration is in irreconcilable conflict with physical facts established by plaintiff's uncontradicted evidence.

At the time of the collision, the speed of the Schaffer car was not less than thirty miles per hour and the Harris car *had attained* a maximum speed of five miles per hour. The Schaffer car had crossed not less than 27 nor more than 30 feet of Brevard Street. The Harris car had moved not less than 9 feet. At a speed of thirty miles per hour (44.0 feet per second), the Schaffer car would travel 27 feet in 0.614 seconds and 30 feet in 0.682 seconds. At a speed of five miles per hour, the Harris car would travel 7.33 feet per second.

We assume, for present purposes, the speed of the Harris car *throughout the distance traveled* was five miles per hour. On this phase of the case, the evidence most favorable to plaintiff is that the Harris car was stopped at the northerly line of the pedestrian cross-walk and had traveled only two feet into the intersection when the collision occurred. At a speed of five miles per hour, the time required to travel nine feet (7.33 feet per second) would be 1.22 seconds. In 1.22 seconds, at thirty miles per hour, the Schaffer car would travel 53.68 feet. Thus, after considering all relevant factors in the light most favorable to plaintiff, if the Schaffer car had en-

tered the intersection precisely at the time the Harris car started it would have completely crossed Brevard Street (36 feet) and gone 17.68 feet beyond before the Harris car would have reached the point where the collision occurred. The conclusion is inescapable that both the Shuler and Harris cars had started and were in motion before the Schaffer car entered the intersection and that the testimony to the contrary is without probative value. It is noted that the uncontradicted physical facts are in complete accord with the  testimony of Mrs. Shuler, a disinterested witness.

"As a general rule, evidence which is inherently impossible or in conflict with indisputable physical facts or laws of nature is not sufficient to take the case to the jury, and in case of such inherently impossible evidence, the trial court has the duty of taking the case from the jury." 88 C.J.S., Trial § 208(b)(5); *Powers v. Sternberg,* 213 N.C. 41, 43, 195 S.E. 88; *Atkins v. Transportation Co.,* 224 N. C. 688, 32 S.E. 2d 209; *Ingram v. Smoky Mountain Stages, Inc.,* 225 N.C. 444, 35 S.E. 2d 337; *Tysinger v. Dairy Products,* 225 N.C. 717, 723, 36 S.E. 2d 246; *Carr v. Lee, supra.* It is noted: "The rule that a nonsuit should be directed, if the physical facts disprove the plaintiff's case, is inapplicable if there is a substantial conflict in the evidence tending to prove the physical facts." 88 C.J.S., Trial § 245(c). Here, the relevant physical facts are established by plaintiff's uncontradicted evidence.

Plaintiff, in addition to cases cited above, cites *Cox v. Freight Lines,* 236 N.C. 72, 72 S.E. 2d 25; *Hyder v. Battery Co., Inc.,* 242 N.C. 553, 89 S.E. 2d 124; *Marshburn v. Patterson,* 241 N.C. 441, 85 S.E. 2d 683; *Matheny v. Motor Lines,* 233 N.C. 673, 65 S.E. 2d 361; and *Morrisette v. Boone Co.,* 235 N.C. 162, 69 S.E. 2d 239. Each of these cases has been carefully considered in relation to the factual situation there presented. Suffice to say, we find nothing therein sufficient to justify reversal of the Harris nonsuit under the factual situation presented by the evidence herein.

The foregoing leads to the conclusion, and we so hold, that the judgment of involuntary nonsuit as to defendants Harris was properly entered and, therefore, is affirmed.

## II

### The Schaffer Trial

Plaintiff's assignments of error 4 through 27 are directed to the charge. Each has been carefully considered but none discloses prejudicial error or merits particular discussion. In this connection, it is noted that the jury answered the issues relating to the liability of

defendants Schaffer in plaintiff's favor and awarded damages.

Dr. Powers examined plaintiff on June 22, 1959. He testified as to what plaintiff stated to him, as to what his examination disclosed, and expressed the opinion, *inter alia,* that she had a permanent partial (30%) disability to' her neck.

Plaintiff had alleged and offered evidence tending to show her loss of earnings and her inability to perform the work in which she was formerly engaged. On cross-examination by counsel for defendants Harris, this question was asked: "Doctor, I believe Mrs. Jones has testified that her job was that of inspecting in a hosiery mill which, as she said, was a job at which she sat at a table or bench and handled ladies' hosiery which would be on a form and examined it to see whether they were in shape to sell or not. What is your opinion as to whether or not Mrs. Jones could go ahead and do that kind of work?" The witness answered: "I think that she could, is physically able to do the work, yes." Assignments of error 1 and 2 are directed to the failure to sustain plaintiff's objection to said question and to the denial of plaintiff's motion to strike the answer.

Plaintiff, citing *Marshall v. Telephone Co.,* 181 N.C. 292, 106 S.E. 818, and *Parks v. Sanford & Brooks, Inc.,* 196 N.C. 36, 144 S.E. 364, contends that this opinion evidence was incompetent as an invasion of the province of the jury. The cited cases are readily distinguishable. In each, the opinion evidence considered related to the very issue upon which liability depended. Here, the opinion evidence relates solely to one of several alleged elements of damage. The admissibility of the challenged testimony, under the indicated circumstances, is supported by these decisions: *Green v. Casualty Co.,* 203 N.C. 767, 167 S.E. 38; *Leonard v. Insurance Co.,* 212 N.C. 151, 193 S.E. 166; *Mintz v. R. R.,* 236 N.C. 109, 114, 72 S.E. 2d 38.

Plaintiff's remaining assignments of error are either formal or directed to matters addressed to the discretion of the trial judge. Suffice to say, we find no error in law sufficiently prejudicial to justify a new trial.

As to defendants Harris—affirmed.

As to defendants Schaffer—no error.